UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GODWIN A. EDOHO, | § | |
|     *Plaintiff/Petitioner*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-10-1881 |
| | § | |
| EKEKERE G. EDOHO, | § | |
|     *Defendant/Respondent*. | § | |

## ORDER

Pending before the court is petitioner Godwin A. Edoho's petition for the return of his children under the Hague Convention on the Civil Aspects of International Child Abduction. Dkt. 1. Upon consideration of the petition, the response, the fact record, and the applicable law, the petition is DENIED.

## FINDINGS OF FACT

The following findings of fact are taken from the documents filed by the parties and the testimony of witnesses at the hearing in this matter. In many instances, the testimony of the parties at the hearing differed from their pleadings and the documentary evidence. When conflict occurs, the court has used the information from the parties' written filings and the supporting documents.

1. On June 24, 2000, Godwin A. Edoho ("Godwin") and Ekekere G. Edoho[1] ("Ekekere") were married in Lagos, Nigeria. Ekekere stayed behind in Nigeria awaiting her travel papers while Godwin returned to his place of residence in the Bahamas.

2. In September 2002, Ekekre joined Godwin in the Bahamas where they co-habitated as man and wife.

---

[1] Ekekere G. Edoho has remarried. Her married name is now Ekekere Pearson.

3.      Ekekere testified that Godwin regularly threatened to kill her.  On September 19, 2003, the Bahamian police were called to the Edoho's home for a domestic disturbance.  They warned Mr. Edoho to be on good behavior towards his wife.  Ekekere testified that the threats did not cease until the time that she moved out.

4.      The couple's first son, Uduak Edoho ("Uduak"), was born in the Bahamas on January 11, 2004.  He is now 6 years old.

5.      The couple's second son, Emem Edoho ("Emem"), was born in the Bahamas on August 19, 2006.  He turns 4 years old this month.

6.      According to Godwin's petition, Ekekere moved out of the marital home on March 17, 2008 while he was at work.  Ekekere filed for maintenance and custody of the children.  And, on April 8, 2008, the Bahamian court entered an order granting her custody of the children.  Godwin was to keep the children three days a week; the balance of their time was spent with Ekekere.  Additionally, the order stipulated that all travel must be agreed upon by the parents or, if necessary, granted by the court.

7.      On July 7, 2008, Ekekere filed for divorce predicated on cruelty.  In her petition she alleged *inter alia* that Godwin had subjected her to physical, verbal, and emotional abuse; that he was violent and hot tempered; and that at one point he threatened to kill her and send her corpse back to Nigeria.

8.      In September 2008, Ekekere left The Bahamas, taking Uduak and Emem with her.  She traveled to Houston and lived openly with her sister, her sister's husband, and her sister's four children.

9.      At some point in September, Godwin called Ekekere's job and was told that she was traveling on vacation and would return at the end of November.

10.     On September 2, 2008, Godwin filed an answer in the divorce proceedings denying the allegations of cruelty on his part and counterclaiming that, in fact, Ekekere was the violent one. He alleged, among other things, that she had attacked him with a cooking fork and a kitchen knife; that she refused to wash or clean the home; and that she tried to have him deported. Dkt. 1-11.

11.     At some point in early December of 2008, Godwin called Ekekere's place of work again and was told she was still not back from vacation.

12.     Three months later, on March 13, 2009, Godwin filed a missing persons report with the Bahamian Police Department. According to the Bahamian Police report Godwin came home from work to find his wife and children missing on September 1, 2009.

13.     On March 19, 2009, the Bahamian court entered an order disolving the marriage between Godwin and Ekekere, finding that Godwin's allegations of cruelty supported the dissolution. This order was entered against Ekekere *in abstentia* and her petition was dismissed for failure to prosecute.

14.     Ekekere remarried on March 24, 2009. She and the two boys moved in with her new husband, Frederick Pearson. The court notes that the petitioner contests the validity of the marriage because of the type of decree entered by the Bahamian court. The court takes no position on the validity of the marriage, except to note that Ekekere testified that she believed she was divorced when she married Pearson.

15.     On May 4, 2009, Godwin filed an application for assistance with the U.S. Department of State pursuant to the Hague Convention requesting access to his children. He stated on his application that he was "requesting access, also to have them during vacations, holidays, call them on [the] phone, visit them, and they can also call and visit [him] in the Bahamas." Dkt. 1-7.

16.     On May 20, 2009, the Bahamian Ministry of Foreign Affairs contacted the U.S. Department of State regarding Godwin's Hague Convention application for access to his children. The letter stated that Godwin "does not wish to pursue voluntary return through a U.S. Department of State voluntary return letter." Dkt. 1-7. Notably, the letter also stated that Godwin "is in receipt of information from a private investigator that suggests his wife and children are allegedly in the state of Texas. Apparently, one of his children has been registered at a school in that state." *Id.*

17.     On July 24, 2009, the Bahamian Ministry of Foreign Affairs notified the U.S. Department of State that Godwin had opted to change his Hague Convention application from being granted access to the children to having the children returned to the Bahamas.

18.     Godwin testified that on September 10, 2009, the Bahamian court issued an order granting him full custody of both children and enjoining Ekekere from removing the children from the jurisdiction of the court. However, the record contains only the pleading requesting custody, but no court order granting custody.

19.     On January 20, 2010, the Bahamian court issued a warrant for the arrest of Ekekere for her violation of its order of April 8, 2008, restricting the removal of the children absent consent of either both parents or the court.

20.     Godwin filed a petition for return of the children in the Southern District of Texas on May 25, 2010. Additionally, he requested that the court order the children taken into the custody of Children's Protective Services until a determination on the petition could be made.

21.     On June 17, 2010, the court held a hearing and determined that Ekekere was not a flight risk and ordered that she surrender her and the children's passports, and register the children in the NCIC database. The parties requested discovery on an expedited basis to be completed in 30 days and a hearing on the merits of the petition on July 15, 2010. Additionally, the court ordered the parties to

submit an agreed proposed order on visitation rights for Godwin. The parties submitted an order which the court signed. Dkt. 6.

22. On July 15, 2010, the court held a hearing on the petition for return of the children. Both Godwin and Ekekere testified along with Ekekere's sister, new husband, and immigration attorney.

23. Godwin testified that he diligently sought his children's whereabouts. He testified that he called the CIA, Interpol, the Bahamian Police, the Nigerian Police, Ekekere's mother in Nigeria, the American Embassy in Nassau, and Ekekere's manager in the Bahamas. Additionally, he called his own sister in London, because he testified that he believed Ekekere's sister was in London. And, he sent his family in Nigeria, with an attorney, to meet with her family in Nigeria to attempt to discover her whereabouts.

24. Godwin testified that he found out his children were in Texas in July 2009. The court notes that the letter dated May 20, 2009 from the Bahamian ministry stated that Godwin was in receipt of information that his wife and children were in Texas. Therefore, Godwin knew his children were in Texas before May 20, 2009.

25. Godwin explained that the reason he waited from the time he discovered their whereabouts until May 25, 2010 to file his petition was that it took him that entire period of time to retain a lawyer sufficiently versed in the Hague Convention to accept his case. Notably, Ekekere found and retained lawyers to defend her in this case within a few days. And, the U.S. Department of State has significant resources available to all parties involved in these Hague Convention cases, including lawyer referrals. Godwin's argument, therefore, lacks plausibility.

26. During her testimony, Ekekere alleged that Godwin was abusive to her and the children. She further explained that because her immigration status in the Bahamas was based on her nursing job

and her marriage to Godwin, she lived in constant fear that Godwin would have her deported by using his influence to have her nursing contract cancelled.

27.     She also made specific allegations that Godwin had sexually abused their older son. Although Ekekere made no report to the Bahamian police regarding the alleged abuse, the record contains uncontested testimony that if Ekekere had reported her husband's alleged sexual abuse of their son to the authorities in The Bahamas and that resulted in Ekekere's deportation to Nigeria, she would be killed upon reaching Nigeria.  However, her sister confirmed that Ekekere had informed her of the abuse at the time it was occurring.

28.     Ekekere testified that the oldest son—Uduak—will start first grade this year.  He attended kindergarden here last year.  He is on the soccer team, has participated in a summer reading competition, and sings in the family's church's choir.  She testified that the younger son—Emem—while too young for school participates karate class.  Both children regularly attend Sunday school at the family's church along with their cousins.

29.     Ekekere has remarried to Frederick Pearson.  The children get along well with their stepfather, calling him Daddy Fred.  At the time of the hearing Pearson was unemployed.  However, he had a job interview and testified to his intent to get a job through which he could buy health insurance for his wife and stepsons.

30.     Ekekere testified that she was in the process of applying for an adjustment of immigration status based on her marriage.  The adjustment would also apply to the children.

31.     After the hearing, the court ordered that Uduak be evaluated by a mental health professional to determine—if possible—whether he had been sexually abused by his father.  Dkt. 21.  The Children's Assessment Center preformed an initial assessment, consisting of a forensic interview and a medical examination.  They found no evidence of sexual abuse in this initial assessment.

**CONCLUSIONS OF LAW**

**ICARA**

1.  The International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.*, implements the "Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980, [which] establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights." 42 U.S.C. § 11601(a)(4). The purpose of ICARA is to empower courts to restore the pre-abduction status quo, not determine the merits of any underlying custody claim. § 11601(b); *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

2.  The Convention requires that a court *shall* order the return of a child if the petitioner can demonstrate by a preponderance of the evidence that:

    (1) a child under the age of 16

    (2) was wrongfully removed or retained by a parent outside the child's country of habitual residence

    (3) in breach of rights of custody awarded to the non-removing parent under the laws of that country, and

    (4) at the time of removal the non-removing parent was exercising those custody rights.

*Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342–43 (5th Cir. 2004); Convention, art. 12.

3.  "Under the Hague Convention, a petitioner shows that a child's removal was "wrongful" by demonstrating that (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal was in breach of petitioner's custody rights under the law of his home State, and (3) the petitioner had been exercising those rights at the time of removal." *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 841 (S.D. Tex. 2006) (Hittner, J.) (citing *Bader*

*v. Kramer*, 445 F.3d 346, 349 (4th Cir. 2006); *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006); *Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004)).

4.   A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective. *Id.* (citing *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d. Cir. 1995)). To establish a habitual residence, there must be a settled intention to abandon the residence left behind and an actual change in geography for a period of time that is sufficient for acclimatization. *Id.* (citing *Holder v. Holder*, 392 F.3d 1009, 1016 (9th Cir. 2004); *Mozes v. Mozes*, 239 F.3d 1067, 1078 (9th Cir. 2001)). Here, the parties do not dispute that the children were habitually residing in the Bahamas at the time of their removal.

5.   In May 2010, the United States Supreme Court held that a "*ne exeat* right is a right of custody under the Convention." *Abbott v. Abbott*, ___ U.S. ___, 130 S. Ct. 1983, 1990 (2010). The custody and maintenance order of April 8, 2008 contained a *ne exeat* clause.[2]

6.   In relation to the petitioner's exercise of his custody rights, "American courts have interpreted 'exercise' broadly." *Sealed Appellant*, 394 F.3d at 344 (collecting cases). The Fifth Circuit has held that "in the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights." *Id.* at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id.* Although they do not agree on the extensiveness and quality of the exercise of custody rights, the parties do not dispute that Godwin was exercising his rights of custody at the time of removal.

---

[2] A *ne exeat* clause is defined as "[a]n equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction." BLACK'S LAW DICTIONARY 1131 (9th ed. 2009).

### Affirmative Defenses to ICARA and Their Relative Burdens

7. "Although the Hague Convention mandates the return of a child wrongfully removed, the judicial duty to order return of a wrongfully removed or retained child is not absolute." *Van Driessche*, 466 F. Supp. 2d at 845. The removing parent may assert a few narrow affirmative defenses to prevent removal. However, "[a]s the federal statute implementing the Convention makes clear, these four exceptions are meant to be 'narrow.'" *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999) (citing 42 U.S.C. § 11601(a)).

8. The removing parent can prevent removal by establishing by clear and convincing evidence that either (1) the return would cause grave risk to the child's mental or physical well-being; or (2) principles relating to the protection of human rights and fundamental freedoms do not permit the return of the child. 42 U.S.C. § 11603(e)(2)(A); Hague Convention , arts. 13(b) and 20; *Sealed Appellant*, 394 F.3d at 343.

9. A removing parent can also prevent return of the child if she can demonstrate by a preponderance of the evidence that (a) the non-removing parent was not exercising custody rights at the time of removal; (b) the child is of proper age and maturity and has decided she does not want to return; or (c) at the time of commencement of proceedings, more than one year has elapsed since the child's removal and the child is settled in her new environment. § 11603(e)(2)(B), (f)(3); Hague Convention, arts 12 and 13; *Sealed Appellant*, 394 F.3d at 343.

### The "Grave Risk" Defense

10. The court is "not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."

Convention, art. 13(b). ICARA requires that this defense be proven by clear and convincing evidence.[3] 42 U.S.C. § 11603(d).

11. The court heard conflicting testimony from Godwin and Ekekere regarding the alleged sexual abuse of the older son. The Children's Assessment Center evaluated him, and their findings were inconclusive. Therefore, Ekekere has failed to meet her burden on this defense.

### The "Well-Settled" Defense

12. Where, as here, the petition for return is brought more than a year after the removal of the children, the removing parent can prevent return by demonstrating that the children are settled in their new environment. Convention, art. 12. The Ninth Circuit has recently addressed the well-settled defense.

> In determining whether a child is settled within the meaning of Article 12, we consider a number of factors that bear on whether the child has "significant connections to the new country." These factors include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability. In some circumstances, we will also consider the immigration status of the child and the respondent. In general, this consideration will be relevant only if there is an immediate, concrete threat of deportation. Although all of these factors, when applicable, may be considered in the "settled" analysis, ordinarily the most important is the length and stability of the child's residence in the new environment.

*In re B. Del C.S.B.*, 559 F.3d 999, 1009 (9th Cir. 2009) (quoting 51 Fed. Reg. at 10509).

"Additionally, for the child to be well-settled, the court should consider more than whether he or she

---

[3] "Clear and convincing evidence is evidence that produces in your mind a firm belief or conviction as to the matter at issue. This involves a greater degree of persuasion than is necessary to meet the preponderance of the evidence standard; however, proof to an absolute certainty is not required." DISTRICT JUDGES ASSOCIATION, FIFTH CIRCUIT, PATTERN JURY INSTRUCTIONS (CIVIL CASES) § 2.14 (2009).

has a comfortable material existence, taking into consideration the child's living environment and any active measures taken to conceal a child." *Van Driessche*, 466 F. Supp. 2d at 848.

13. The children are well-settled in Houston. The have been in Houston for almost two years. They live close to extended family with which they have significant contact. They both participate in activities, attend Sunday school, and go to church regularly. The older child has already attended one year of school here and is enrolled in first grade starting this fall. Although the mother and step-father were unemployed at the time of the hearing, they both testified to their efforts to gain employment and are employable.

14. The record reflects that Godwin suspected his children's presence in Texas sometime before May 20, 2009. Since he filed his petition on May 25, 2010, over a year has passed from discovery to filing. The one year period may be equitably tolled if Godwin can demonstrate that Ekekere secreted the children away from him. *Furnes v. Furnes*, 362 F.3d 702, 723 (11th Cir. 2004).

15. "[A] court may equitably toll the one-year period where two related conditions are met: (1) the abducting parent concealed the child and (2) that concealment caused the petitioning parent's filing delay." *In re B. Del C.S.B.*, 559 F.3d at 1015. (citing *Duarte v. Bardales*, 526 F.3d 563, 570 (9th Cir. 2008)). This determination is an equitable one, taking into account all of the facts surrounding the removal and discovery of the children, including the efforts made to secrete the children by the removing parent, and the efforts made to locate the children by the non-removing parent.

16. Ekekere made no effort to conceal the children. While she did not inform Godwin of her whereabouts, she went to live openly with a known relative, she did not change her name or the children's names, and she enrolled Uduak in school.

11

17.     Even if Ekekere had made some effort to conceal her whereabouts, the concealment did not cause the petitioning parent's filing delay.  Godwin waited six months from the time his wife left The Bahamas with the children before filing a missing persons report with the Bahamian Police.  The efforts he did take to find them could not be described as determined or diligent.  For example, he called her work to determine if they knew her whereabouts, but only once a month.  And, he sent his family in Nigeria to her family to ask her whereabouts, but not until June 2009.  Additionally, the record reflects that his other efforts were equally desultory.  Therefore, the court finds that equitable tolling is not appropriate in this case.

## Conclusion

Pedning before the court is Godwin Edoho's petition for the return of his children under the Hague Convention on the Civil Aspects of International Child Abduction.  The petition was filed over a year from the discovery of the whereabouts of the children.  Equitable tolling of that one year period is not appropriate on this record.  And, the court finds that the children are "well-settled" in their new home.  § 11603(e)(2)(B), (f)(3); Hague Convention, arts 12 and 13.  Therefore, the petition of Godwin Edoho for the return of his children is DENIED.  This case is DISMISSED.  Each party shall bear its own costs.

It is so ORDERED.

Signed at Houston, Texas on August 17, 2010.

_____
Gray H. Miller
United States District Judge